UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WILLIAM D. SMITH,

        Plaintiff,

        v.

NEW YORK STATE BOARD OF
PAROLE, *et al.*,

        Defendants.

20-CV-1822-LJV
DECISION & ORDER

_____

On December 11, 2020, the *pro se* plaintiff, William D. Smith, commenced this action under 42 U.S.C. § 1983. Docket Item 1. He alleges that Parole Officers Shannon Miller and Zachary Aylsworth violated his right to due process when they acted with deliberate indifference to his safety by requiring him to live in unsanitary conditions.[1] *See id.*; Docket Item 19 (amended complaint).

On January 22, 2024, Miller and Aylsworth moved for summary judgment. Docket Item 38. Smith did not respond, *see* Docket Item 39, so on March 28, 2024, this Court ordered him to show cause why the Court should not decide the motion for summary judgment based only on the defendants' submissions, Docket Item 40. Smith did not respond to that order, and his time to do so has expired. *See id.* The Court therefore decides the pending motion based on Miller's and Aylsworth's submissions.

For the reasons that follow, Miller's and Aylsworth's motion for summary judgment is granted.

---

[1] Smith asserted claims against several other defendants, but this Court dismissed those claims without leave to amend. *See* Docket Items 11 and 21.

**BACKGROUND**[2]

Smith had been incarcerated and "was under the parole supervision of the New York State Department of Correction[s] and Community Supervision" during the events giving rise to this action. Docket Item 38-2 at ¶ 1. Because he "is a level 3 sex offender subject to the Sexual Assault Reform Act" ("SARA"), Smith "is prohibited from residing within one thousand . . . feet of any school grounds[] or place in which [sic] minor children may frequent." *Id.* at ¶ 4. When he was incarcerated, Smith "was unable to provide . . . an address to which he could be released."[3] *Id.* at ¶ 6. He therefore was

---

[2] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party. *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Loc. R. Civ. P. 56(a)(1).

The following facts are taken from the defendants' statement of undisputed facts, Docket Item 38-2—which Smith did not contest—and the admissible evidence submitted in support of the defendants' motion for summary judgment, Docket Items 38-3, 38-4, and 38-5. They are viewed in the light most favorable to Smith.

[3] The defendants explain "[t]he standard practice and procedure" that applies when a parolee who is a sex offender seeks "to change his residence":

> (1) the parolee provides a prospective address to his parole officer and a SARA compliance check is conducted; (2) the parolee is notified as to whether or not said address is SARA compliant; (3) if [the address is] compliant, the parolee confirms with the landlord/owner that the property is available and that said landlord is willing to rent to the parolee; (4) the parolee informs his parole officer that the landlord/owner has agreed to rent him the property and the parole officer conducts a[n] inspection of the property . . . ; (5) the parole officer notifies the parolee that the residence is approved; and (6) the parolee informs the parole officer that he has in fact moved.

Docket Item 38-4 at ¶ 8. "A parolee is permitted to submit an address for review and approval at any time." *Id.* at ¶ 9.

"designated as 'undomiciled'" and "referred to Saving Grace Ministries" ("Grace House"), a halfway house.  *See id.* at ¶¶ 6-7; Docket Item 38-5 at 51-52.  And when Smith was released from Wende Correctional Facility on November 21, 2018, he "reported to Grace House['s 1932 Bailey Street location] for emergency temporary housing."  Docket Item 38-2 at ¶¶ 8-9.

A few days later, on November 26, 2018, Smith informed Parole Officer Miller of "a bedbug issue" at Grace House.[4]  *Id.* at ¶ 9.  Miller told Smith "that he could seek other living arrangements," and she "provided [him] with the addresses of three rooming houses that ha[d] previously been approved for parolees who are sex offenders."  *Id.* at ¶¶ 9-10.  Miller also told Smith that he should not move out of Grace House until she approved another address.  Docket Item 38-5 at 31.  But Smith "did not provide Miller with any possible addresses for review and approval," and he "failed to update Miller on the outcome of the three referrals that she provided."  Docket Item 38-2 at ¶ 11.

On January 14, 2019, "Miller conducted SARA compliance checks on 11 potential residences and informed [Smith] of the viable options."  *Id.* at ¶ 12.  But Smith "did not provide Miller with any follow-up information regarding [those] addresses."  *Id.* at ¶ 13.  In fact, Smith met with Miller and another parole officer on January 25, 2019, and "admitted that he failed to provide Miller with the information necessary for him to change residences."  *Id.* at ¶ 14.

---

[4] Records indicate that Grace House's 1932 Bailey Street location "was exterminated prior to [Smith's] release to parole."  Docket Item 38-2 at ¶ 25; *see* Docket Item 38-5 at 38-39 (copy of email from Grace House staff stating that "[e]xtermination services will take place at 1932 Bailey on Monday, October 8, 2018").  And that location received extermination services at least once while Smith resided there.  Docket Item 38-2 at ¶ 25; *see* Docket Item 38-5 at 36 (record of bedbug extermination dated January 10, 2019).

The officers "encouraged" Smith "to seek [other] accommodations," *id.*, and a few days later, Smith "provided Miller with a potential address for a new residence," *id.* at ¶ 15.  But after a "SARA compliance check[,] . . . the home was deemed non-compliant." *Id.*  On February 8, 2019, Smith "again admitted that he was provided with potential addresses for a new residence," but he said those residences "were either too expensive or did not have space available."  *Id.* at ¶ 16.

Smith "did not provide any possible addresses for review and approval" from January 28 to April 1, 2019, when his supervision "was transferred to Parole Officer Aylsworth."  *Id.* at ¶¶ 17-18.  Then, on April 5, 2019, Smith "was placed in permanent housing at Grace House['s 1900 Bailey Street location] by the Erie County Department of Social Services" ("DSS").  *Id.* at ¶ 19.  In April and May, Smith still "did not provide any possible addresses for review and approval."  *Id.* at ¶ 21.  So on May 23 and June 11, 2019, Aylsworth "encouraged [Smith] to look for new accommodations."  *Id.* at ¶¶ 20, 22.

On June 13, 2019, Smith "provided a potential address for review."  *Id.* at ¶ 24.  But, Smith explained, he "was under a 45-day sanction from DSS, his sole source of income," and "would need to wait until it was over before he could explore that option." *Id.*

## LEGAL PRINCIPLES

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable

4

conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant." *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)). Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *Id.* "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence." *Id.* "An unopposed summary judgment motion may . . . fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation and internal quotation marks omitted).

## **DISCUSSION**

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). But that rule is not absolute: When a "special relationship" exists between the state and an individual, the state assumes some responsibility for the individual. *See Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). Specifically, the state has an affirmative duty "when the [s]tate by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *DeShaney*, 489 U.S. at 200. "[I]nvoluntary custody" is the "linchpin of any special relationship." *Matican*, 524 F.3d at 156.

"A parolee, although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed." *Jacobs v. Ramirez*, 400 F.3d 105, 106 (2d Cir. 2005) (per curiam).  "[B]ecause the limitations imposed [on parolees] by the state are minimal," however, "so too are the duties [the state] assumes." *Id.* at 107.  Moreover, to prevail on a Fourteenth Amendment due process claim, a plaintiff "must show that the officers' behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Matican*, 524 F.3d at 155 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).

This Court previously construed Smith's amended complaint to allege that Miller and Aylsworth violated his right to due process "by acting with deliberate indifference to his safety and requiring him to live in a bedbug-infested halfway house." *See* Docket Item 21 at 9-11.  Miller and Aylsworth argue that those claims must be dismissed because they did not require Smith to live at Grace House and did not exhibit deliberate indifference to the conditions there.  Docket Item 38-1.  In light of the evidence the defendants have submitted and Smith's failure to provide any evidence to the contrary, this Court agrees.

First, it is clear from the record that Miller and Aylsworth did not force Smith to live at Grace House.  On the contrary, as Smith admitted during his deposition, *see* Docket Item 38-5 at 88, 96-97, 106-07, they repeatedly told him that he could find other accommodations, and they even suggested other potential residences, *see* Docket Item 38-2 at ¶¶ 9-10, 12, 14; *see also* Docket Item 38-3 at ¶¶ 13-14, 16, 18.  It is true that

6

Miller once told Smith that he could not move out of Grace House until she approved another address.  See Docket Item 38-5 at 31.  But that clearly cannot sustain an inference that Smith was "effectively compelled" to live at Grace House, especially in light of Miller's suggesting other accommodations that Smith admittedly did not look into.  See Jacobs, 400 F.3d at 107 (emphasis omitted).[5]

Smith largely failed to submit other addresses for review and approval, see Docket Item 38-2 at ¶¶ 11, 13-14, 16-17, 21, and the one address he did submit "was deemed non-compliant" because it was too close to a school, see id. at ¶ 15 (citing Docket Item 38-5 at 21).  In fact, Smith himself testified that the residence he submitted was too close to a prohibited location.  See Docket Item 38-5 at 83-84.  Smith's failure to actively pursue other housing arrangements—arrangements that the defendants

---

[5] In Jacobs, the district court sua sponte dismissed a parolee's complaint alleging "that the defendant parole officers violated [his] civil rights" by, inter alia, "paroling him to his mother's unsafe and unsanitary residence" and "refusing his request to relocate to a homeless shelter."  See Jacobs, 400 F.3d at 105.  The Second Circuit reversed, noting that Jacobs "allege[d] that the state effectively compelled him to live in unsafe conditions."  Id. at 107.  "[T]aking all the allegations in the complaint as true," the Second Circuit "[could not] conclude beyond doubt that [Jacobs could] prove no set of facts that would entitle him to relief."  Id. at 106-07 (citations and internal quotation marks omitted).  But, it noted, "the evidence may well show that [Jacobs's] liberty was not so curtailed by the conditions of his parole that he could not himself undertake to repair the defects of which he complains."  Id. at 107.

Smith's allegations that he was required to live in unsanitary conditions are comparable to Jacobs's allegations, and Smith's claims against Miller and Aylsworth therefore survived screening under 28 U.S.C. § 1915(e) when this Court accepted his allegations as true.  See Docket Item 21.  But in light of the evidence submitted by the defendants, it is clear that Smith was not in fact forced to live at Grace House, and therefore is not "entitle[d] . . . to relief."  See Jacobs, 400 F.3d at 107.  Indeed, the evidence shows that Smith had the ability "to repair the defects of which he complains" by pursuing other housing options.  See id.  In other words, Jacobs is distinguishable and does not mandate denial of the defendants' motion for summary judgment.  In fact, dicta in Jacobs supports granting the motion.

7

suggested and encouraged—undercuts his claim that he was forced to live in unsanitary conditions. *Cf. Jacobs*, 400 F.3d at 107 (suggesting that parolee cannot "show that his liberty was . . . curtailed by the conditions of his parole" if "he could . . . himself undertake to repair the defects of which he complains").

What is more, Miller's and Aylsworth's encouragement that Smith find other housing and their efforts to help him do so by referring him to possible residences shows that they did not act in a way that "may fairly be said to shock the contemporary conscience." *See Matican*, 524 F.3d at 155 (citation omitted). Smith may not have been satisfied with the defendants' help. He may think they should have done more. But they were not constitutionally required to do so. In other words, there is no colorable argument that Miller's and Aylsworth's conduct was so "outrageous" that it violated Smith's right to due process.

In light of the evidence provided by the defendants, no reasonable jury could find that the defendants "*require[d]* [Smith] to remain in a place that turned out . . . to be uninhabitable." *Cf. Jacobs*, 400 F.3d at 107. Nor could a reasonable jury find that the defendants ignored his complaints or otherwise acted in a way that "may fairly be said to shock the contemporary conscience." *See Matican*, 524 F.3d at 155 (citation omitted). Therefore, even when the evidence is viewed in the light most favorable to Smith, Miller and Aylsworth are entitled to judgment as a matter of law. Their motion for summary judgment therefore is granted.

**CONCLUSION**

For the reasons stated above, the defendants' motion for summary judgment, Docket Item 38, is GRANTED. Smith's amended complaint, Docket Item 19, is DISMISSED. The Clerk of the Court shall close this case.

This Court hereby certifies, under 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and leave to appeal to the Court of Appeals *in forma pauperis* is denied. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated:  May 2, 2024
        Buffalo, New York

                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE